## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **LAURA L. DILLON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **8:05CV467** |
| | ) | |
| **GOTTSCH EMPLOYERS GROUP, LLC, a** | ) | **MEMORANDUM** |
| **Nebraska Limited Liability Company, and** | ) | **AND ORDER** |
| **GOTTSCH FEEDING CORPORATION, a** | ) | |
| **Nebraska Corporation, both doing business** | ) | |
| **as Gottsch Enterprises,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the magistrate judge by consent of the parties on defendants' Motion for Summary Judgment [37].  The parties have substantially complied with the requirements of NECivR 56.1.

In her Amended Complaint, plaintiff asserted employment discrimination claims[1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and the Nebraska Fair Employment Practices Act ("NFEPA"), Neb. Rev. Stat. §§ 48-1101 through 48-1126; and a claim for overtime compensation pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").  The court has carefully reviewed the pleadings, the briefs, and the evidentiary materials filed by the parties.  For the reasons explained below, the motion for summary judgment will be granted as to the claims pursuant to Title VII and the NFEPA, and denied as to the FLSA claim.

---

[1]Plaintiff initially pled a cause of action for hostile environment sexual harassment but now concedes there is insufficient evidence to succeed at trial on a theory of hostile environment.  Filing 42, Plaintiff's Brief.  Her Title VII claim based on hostile environment sexual harassment is, therefore, deemed withdrawn.  The Title VII claim based on retaliation remains pending.

## I.  FINDINGS OF FACT

I find that the following facts are uncontroverted for purposes of this Motion for Summary Judgment and constitute the material facts upon which a resolution of these issues must be premised.

Plaintiff was employed by Gottsch Feeding Corporation ("Gottsch") from approximately August 18, 2003, until August 20, 2004 as an inventory and financial accountant.  She was hired by Dave Luth, the controller of the company, and Norma Bartlett Hansen, the office manager.  Her starting pay was $10.00 per hour.  Plaintiff's pay was increased to $11.00 per hour after 30 days of employment.

From the start of her employment until November or December 2003, plaintiff inventoried cattle located on Gottsch's feedlot in Deerfield, Kansas.  The job required plaintiff to monitor incoming cattle, the sale of cattle, dead cattle, feeding costs, cattle costs, commissions and insurance with respect to this feedlot.  The Deerfield facility generally accommodated between 40,000 and 45,000 head of cattle.  The number of cattle at the facility ranged from 30,000 to 50,000 head.

In November or December 2003, Luth and Hansen assigned additional duties to plaintiff, which included monitoring the activity involving "grass cattle" or "outside cattle" on 30 to 40 "outside" feedlots owned by Gottsch and located throughout the United States.  She did not receive an increase in pay.

According to Norma Hansen, the grass cattle were owned by Gottsch pursuant to a contractual arrangement.  Gottsch and its customer, Craig Hammond doing business as C. H. Cattle Company, purchased the cattle

> in a verbal agreement that C. H. Cattle Company owned 50 percent and Gottsch Cattle Company owned 50 percent of the cattle.  The agreement at that time was for [Hammond] to purchase the cattle, [Gottsch] one hundred percent financed him, so

> [Gottsch] paid one hundred percent of the cattle cost and financed him.  And he fed the cattle at his backgrounding unit and he paid one hundred percent of the feed cost and then when they went out onto grass, they went out on what we call grass gain and we paid him so much per pound gain per animal.  And what he had paid for in feed cost when they were in backgrounding served as his down payment.

Filing 43-2, Deposition of Norma Hansen at pp. 14-16.  According to plaintiff, Gottsch owned the outside lots, the largest of which had 10,000 head of cattle.  Dave Doering, who oversees the commissioned agents who purchase cattle for Gottsch, began selling the "outside" or "grass cattle" over the internet, but the cattle remained on the Gottsch lots and Gottsch continued to feed the outside cattle until they reached a certain weight.

The change in responsibilities caused plaintiff to rely on and have more contact with Ken Nollette and Dave Doering as sources of information for her inventory reports.  On May 11, 2004, plaintiff received an email which she described as "pornographic" and found to be "thoroughly disgusting."  The email had been forwarded to her by Dave Doering, who had also forwarded the email to company vice-president Brett Gottsch and co-employees Jerry Lehman, Ken Nollete, Laurie Fischer, Mark Smith, Mike Danehey, and Tammy Chromy.  Doering did not type anything into the email or otherwise generate it; he only forwarded it to the named recipients.

When plaintiff opened the email on May 11, 2004 she commented to employee Lehman, "Well, I don't know about you, but I find it thoroughly disgusting."  Other than this comment to Lehman, plaintiff did not discuss the offensive email with any Gottsch employee until May 28, 2004.

Gottsch does not have sick leave, and new employees are not given any written policies about sick leave or who to call or what to do if they are sick.  Gottsch has no employee handbook or any policy or procedure for reporting sexual harassment or misconduct.

Plaintiff was absent from work from Monday, May 24 through Friday, May 28, 2004 due to a stress-related illness brought on by receiving the email. She called in sick on Monday and Tuesday. On Wednesday, Norma Hansen called to ask how plaintiff was feeling; plaintiff told Hansen she still was not feeling well. Someone from Gottsch called plaintiff on Thursday.

On Friday, May 28, Dave Luth called the plaintiff about her absence from work. During this conversation, plaintiff told him she was upset about a pornographic email she had received from Dave Doering on May 11. At her deposition, plaintiff explained that she was struggling with what she should do about the email. The email disgusted her because it contained naked women and she received it at work. She was shocked to see the image, in color, on her computer in the office. It would not have bothered her so much if she received it at home; however, having received it at work, she felt humiliated every time she was around Doering. She was also concerned that an owner of the company, Brett Gottsch, had also received the email and did nothing about it. Plaintiff asked Luth to go to her computer to look at it himself. According to plaintiff, Luth did so, and called her back that day. Luth reportedly said he wanted it to be a pleasant working environment, that plaintiff would be getting an apology from Dave Doering, and Luth would see that it never happened again. Plaintiff testified that Luth's sympathetic response made it easier for her to return to work the next week.

At his deposition, Luth testified that he was surprised that plaintiff received the email on May 11 but did not complain about it until three weeks later. He did believe she was genuinely upset. Luth was embarrassed when plaintiff told him about the email; he never had a situation like that before and wished it would not have happened. Luth contacted Brett Gottsch right after plaintiff told him about the email problem. The substance of the conversation was that they should not have those

-4-

kind of things in the workplace.  According to Luth, Brett Gottsch talked to Dave Doering about the email and Luth understood that Doering made some sort of apology to the plaintiff.

According to Norma Hansen, Brett Gottsch sent a message to all employees directing them to be more professional in their emails.  Brett Gottsch also called Dave Doering at home and reprimanded him, and Doering apologized to plaintiff.

After that reprimand, Doering did not send any further emails of that nature or engage in any inappropriate behavior.  After speaking with Luth about the email on May 28, 2004, plaintiff made no further complaints to any Gottsch employee regarding Doering or any sexually related workplace issue.

When plaintiff returned to work after the Memorial Day holiday, she was called in to meet with Dave Luth and Norma Hansen.  Hansen testified that they talked to plaintiff about how they needed her to be at work, and told her that her position was very important.  It was important that she be at work and it was important that she call when she was not going to be there.  They knew plaintiff was under a lot of stress at home[2], so they suggested taking away the month-end reconciliation to make the load lighter for her.  After a couple months, if she was feeling better, then they would give it back.  This arrangement was not considered a demotion, and did not involve a pay cut,  although it would affect the amount of plaintiff's year-end bonus.  During the discussion, Luth and Hansen used the term "administrative assistant," but they intended that plaintiff would do the same work, minus the responsibility for completing the month-end reconciliation.  Hansen explained

---

[2]According to Hansen, plaintiff had previously confided that her husband had a severe drinking problem and was abusive and obnoxious.  Plaintiff had trouble sleeping and missed a lot of work because of that.  Hansen stated that plaintiff told her she was ill the last week of May 2004 because of her husband. The following Monday, Hansen learned from Luth that plaintiff was actually upset about the email.

that the month-end reconciliation must be completed by the fifth day of the following month, and it can involve a lot of pressure.  They thought they needed to do something, considering plaintiff's failure to show up for work.

Dave Luth recalled meeting with plaintiff when she returned to work after the May 2004 absence.  He had been concerned that they were getting behind and needed to get work done.  It was discussed that they would probably need to hire another employee because the work was not getting done.  Luth testified that the company has a stressful environment due to the nature of the work.  The job requires somebody who can handle pressure and not get overly stressed out.  Luth recalled telling plaintiff, "we have to have butts in those seats," because otherwise they would get too far behind.  When he said, "we need butts in those seats," it was his intention to communicate that plaintiff should call in every day she was going to be absent; however, plaintiff was not expressly told that she was required to call in every day she was going to be absent from work.

Plaintiff was not ever made an "administrative assistant" and neither her job title nor her job duties changed between the time she complained about the email and her termination from employment.

Plaintiff testified she knew her coworkers were aware she had complained about the email because of the way they were acting towards her. According to plaintiff, everyone in the office except for Norma Hansen, Dave Luth and Jerry Lehman refused to talk to her for a while.  Dave Doering avoided her completely.  When she returned to the building, two female employees looked at her, turned around, and walked out the door without saying anything to her.  After a few days, they did get better, but getting the "cold shoulder" upset plaintiff and made it hard to concentrate on what she was doing.  Significantly, Ken Nollette quit coming in to her office or contacting her directly

with the information she needed to do her job. Nollette would not talk to her at all unless she went to him and specifically asked for something. Previously, he would come to her office or telephone her several times a day with information. Due to Nollette's behavior, it took plaintiff longer to get her work done and meet deadlines.

Some time in July 2004, plaintiff talked to Norma Hansen about her difficulties with Mr. Nollette. She went to Hansen's office, stated that they were coming up on a very busy time of the year, and she needed to get the working relationship back with Ken. Hansen recalled that plaintiff said she didn't have the relationship with Ken and Dave that she used to; they didn't joke around with her and have fun. Nollette and Doering were going through Hansen to convey information, not going to plaintiff directly, and that bothered the plaintiff. Hansen estimated that Nollette provided about 10% of the information that plaintiff needed to perform her job. Hansen told plaintiff she would talk to Nollette about it, but he probably would not change. Hansen testified that Nollette did not feel comfortable around plaintiff because "he does tend to joke" and he did not want to come across wrong. Hansen did speak to Nollette about the situation, but he indicated he did not intend to change, as he did not want anything he said to be taken wrong.

Plaintiff did not actually discuss the email with Norma Hansen until the July conversation. Hansen learned about the existence of the email when employee Laurie Fischer received the email, called Hansen on the phone, and said, "Oh my gosh you should see this e-mail that Dave Doering just sent." Hansen went to Fischer's office, looked at the email, and said, "Oh that's disgusting." Hansen testified that Fischer deleted the message "and that was it." Hansen recalled hearing other employees discussing plaintiff's being upset about the email. Jerry Lehman told Hansen he remembered plaintiff opening it and being upset. He told Hansen that he did not say anything to

plaintiff but remembered thinking to himself, "You're an adult, delete it and go on." Hansen testified at her deposition that they all thought it was "big deal. It was an offensive e-mail.... [I]t wasn't something that should have been sent around an office." To Hansen's knowledge, this was the only time such a message has been sent around the workplace. If Doering had sent her another one, she would have told him to stop it. She did not discuss the May 11, 2004 email with Dave Doering.

According to plaintiff, nothing ever changed after her July conversation with Hansen. Due to Nollette's behavior, she was unable to get closeouts done as soon as she would like. For example, she had to complete 40 or 50 closeouts for a manager's meeting in August. The task took a lot longer than it should have, due to the continuing struggle to get information. The problem also would have affected her compensation, as plaintiff's yearly bonus would be determined by the timeliness of her finishing the closeouts; however, she had not been with the company long enough to receive a yearly bonus. Plaintiff was never disciplined or reprimanded for her performance, including anything related to being unable to complete closeouts due to Nollette's withholding information.

During his deposition, Dave Luth noted that it was a small office; he did not know how coworkers knew that plaintiff had complained about the email. He did not recall plaintiff complaining to him about how people were treating her.

In early August 2004, Luth and Hansen hired a woman named Karen Sullivan to assist plaintiff in implementing a new computerized cattle accounting program. Hansen testified that Sullivan did not know how to operate that program. Plaintiff did know how to operate the program and was instrumental in getting the program up and running. Plaintiff was told that Sullivan was to be her assistant and that Norma Hansen would train her. Sullivan, however, was put in plaintiff's

office and plaintiff taught her the job functions.  Luth testified he believed that Sullivan was a better

fit with the company because she was emotionally stable.

Plaintiff was then absent for several consecutive days, from August 16-20, 2004.  On August

16, she called in sick.  She did not call in on August 17.   On August 18, she called in the late

morning and apologized for not calling the previous day.   Plaintiff told Hansen during that

conversation that she and her husband were both ill  and that she had a doctor's appointment on

Friday, August 20, for the removal of a cyst.  Hansen told plaintiff to keep her informed, meaning

that plaintiff should call Hansen if she was not going to be at work.  The parties disagree as to

whether Hansen told plaintiff to take the rest of the week off.  Plaintiff did not call in on August 19

or August 20.  In the late afternoon of August 20, Hansen called the plaintiff and left a message on

plaintiff's answering machine.  Plaintiff returned Hansen's call, at which time Hansen said she

needed to talk to plaintiff before Monday.  When asked why, Hansen told plaintiff that the company

was going to let her go.  Dave Luth joined the conversation. They both told plaintiff they had to let

her go.  According to plaintiff, the reason given was that plaintiff had been sick and missed that week

of work.

Dave Luth testified it was his decision to terminate plaintiff, after discussing the matter with

Norma Hansen.  His decision was based on "performance, for the most part and fitting into the

culture of the company."  Luth explained that he thought it was important to be able to fit in with

people, to be able to work one-on-one in a team environment.  In this case, there was not a positive

interaction.  Early in her employment, Luth received a complaint that plaintiff had somehow

"belittled" the office manager at the Deerfield facility by behaving as if her position was more

important than that of the office manager.  Luth supported plaintiff on that issue and, in her first two

months, plaintiff did a really good job.  As time went on, Luth got the feeling that plaintiff was struggling emotionally with things not related to work.  Luth commented that plaintiff missed a lot of Mondays, which indicated to him that she was a person who was not committed to work.  He did not know anything about plaintiff's personal life.  Norma Hansen also raised concerns about plaintiff's absences and inability to get things done.  Luth was under the impression that, in her last 10 months, plaintiff missed 25 days of work.  Norma Hansen, however, stated that plaintiff was absent 13 days between her start date of August 18, 2003 and May 2004.  Hansen testified that plaintiff was ultimately let go "because she had missed a lot of work and she had not called several times in prior absences."

Plaintiff's time cards show that plaintiff worked more than 40 hours per week in 22 out of the 26 pay periods covering August 19, 2003 through August 16, 2004.  There is evidence that Gottsch was investigated by the U.S. Department of Labor regarding overtime compensation for its employees.  It was determined that Jerry Lehman was entitled to receive overtime with respect to his work involving "grass" cattle.   Plaintiff also did work involving "grass" cattle.  Norma Hansen testified it was her understanding that "anyone that worked with customer cattle that was one hundred percent owned by a customer would get overtime."  Dave Luth testified he was told that if someone worked on cattle that were owned 100% by somebody else, Gottsch would have to pay them overtime.  But if they worked on cattle that were owned exclusively by Gottsch or someone in partnership with Gottsch, overtime was not required.  Luth testified that everyone who worked for Gottsch was exempt from overtime pay requirements.

-10-

## II.  LAW

### A.   Jurisdiction

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, and 1441(c). Venue in this court is proper under 28 U.S.C. § 1391.

### B.   Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Harder v. ACandS*, 179 F.3d 609, 611 (8th Cir. 1999).  "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.  *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997); NECivR 56.1(a).

-11-

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)). A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998). In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998); *see* NECivR 56.1(b).

### C.   Claims against "Gottsch Employer's Group, LLC"

The evidence is uncontroverted that plaintiff's actual employer was defendant, Gottsch Feeding Corporation. Gottsch Employer's Group, LLC was formed to conduct payroll management for the various Gottsch business holdings. Since the plaintiff was not employed by Gottsch Employer's Group, it cannot be held liable on any of plaintiff's causes of action, and summary judgment will be granted in favor of Gottsch Employer's Group on all claims.

### D.   Claim for Overtime under the Fair Labor Standards Act (FLSA)

Despite evidence of plaintiff's frequent absenteeism, it is uncontroverted that plaintiff worked more than 40 hours per week in 22 out of the 26 pay periods covering August 19, 2003 through August 16, 2004. The FSLA generally requires that covered employees must be paid one-and-one-half times their regular hourly rate for hours worked in excess of 40 per week. *Baldwin v. Iowa Select Farms, L.P.*, 6 F. Supp. 2d (N. D. Iowa 1998) (citing 29 U.S.C. § 207(a)(1)). There

-12-

are, however, several exemptions to the FLSA's overtime pay requirements, and Gottsch contends

that plaintiff was an exempt employee under the FLSA's agricultural exemption, 29 U.S.C. § 213(b),

which states:

> The provisions of section 207 of this title shall not apply with respect to –
> * * * *
> (12)  any employee employed in agriculture ....; or
> (13)  any employee with respect to his employment in agriculture by a farmer, notwithstanding other employment of such employee in connection with livestock auction operations in which such farmer is engaged as an adjunct to the raising of livestock, either on his own account or in conjunction with other farmers, if such employee (A) is primarily employed during his workweek in agriculture by such farmer, and (B) is paid for his employment in connection with such livestock auction operations at a wage rate not less than that prescribed by section 206(a)(1) of this title[.]

The term "agriculture" is defined as follows:

> "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f).  Gottsch also cites several regulations promulgated by the Secretary of Labor in

support of its assertion that plaintiff was not entitled to receive overtime compensation.

Assuming, without deciding, that the ownership of the cattle located on the Gottsch

properties is the determining factor as to whether Gottsch employees are entitled to overtime under

the FLSA, the court finds that issues of material fact exist on that issue.  At least one Gottsch

employee with whom plaintiff worked was found to be entitled to overtime payments of some sort.

Plaintiff testified that some of her work involved accounting for "outside" cattle which may or may

-13-

not have been owned solely by Gottsch.  Ms. Hansen's explanation of Gottsch's "verbal agreement" involving C. H. Cattle Company and their respective ownership interests in the grass cattle or outside cattle is less than clear.

Exemptions from NLRA coverage "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *see also Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 399 (1996) ("administrators and reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach.").  The burden of establishing entitlement to the agricultural exemption is always borne by the employer.  *See generally* Deborah F. Buckman, Annotation, *Who Is "Employee Employed in Agriculture" and Therefore Exempt from Overtime Provisions of Fair Labor Standards Act by § 13(b)(12) of Act (29 U.S.C.A. § 213(b)(12)),* 162 A.L.R. Fed. 575 (2000) (Westlaw).  On this record, I find that Gottsch has not met its burden of proving entitlement to the asserted exemption, and its Motion for Summary Judgment must be denied as to plaintiff's claim for overtime compensation.

## E.   Title VII – Retaliation

Plaintiff has conceded that the record does not support her claim for hostile environment sexual harassment.  She contends, however, that Gottsch retaliated against her for complaining about the May 11, 2004 email in violation of 42 U.S.C. § 2000e-3(a), which provides:

**(a)  Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In this case, there is no direct evidence that Gottsch retaliated against the plaintiff; therefore, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs plaintiff's retaliation claim. *See Carrington v. City of Des Moines*, 481 F.3d 1046, 1050 (8th Cir. 2007). The plaintiff bears the burden of establishing a prima facie case, showing "1) she engaged in protected conduct; 2) a reasonable employee would have found the challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct." *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006)).

> In *Burlington Northern*, the Supreme Court announced a different standard for determining whether a plaintiff has established a retaliation prima facie case. Because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," a plaintiff need not show an adverse employment action related to the terms and conditions of employment. *Id.* at 2414. Instead, "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citation and internal quotation marks omitted). The standard is thus objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions. *Id.* at 2412-13. The Court explained the action against the plaintiff must still be "materially adverse" noting: "[w]e speak of material adversity because we believe it is important to separate significant from trivial harms," *Id.* at 2415, and "Title VII ... does not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). As such, certain behavior continues to be non-actionable under the retaliation provision such as "petty slights or minor annoyances that often take place at work and that all employees experience," "personality conflicts at work that generate antipathy," and "snubbing by supervisors and co-workers." *Burlington N.*, 126 S. Ct. at 2415.

*Higgins*, 481 F.3d at 589-90.

-15-

If the plaintiff establishes a prima facie case, then Gottsch must articulate a legitimate, non-discriminatory reason for its actions.  The burden then shifts back to the plaintiff to show that the proffered justification was in fact a pretext, a cover up for retaliation.  *Carrington*, 481 F.3d at 1050.

As discussed above, in order to prove retaliation, the plaintiff must show whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the ***employer's*** retaliatory actions.  This objective standard is meant to address ***employer*** actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.   Normally, petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.  *See Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 552 (8th Cir. 2007).

Clearly, plaintiff engaged in protected conduct when she complained to Dave Luth about receiving an obscene email from a co-employee.  In her brief, plaintiff identifies the following actions she contends were made in retaliation for her complaining about the email:

- Threat of demotion (when Luth and Hansen proposed her working as an "administrative assistant" without responsibility for completing the month-end reconciliations);

- Refusal of co-workers to provide necessary information;

- Refusal of co-workers to resume normal office socialization with her; and

- Termination of employment.

Considering the factual record, the court does not believe any of the actions taken by plaintiff's ***employer***, Gottsch, would have dissuaded a reasonable worker from complaining about receiving offensive or obscene communications from co-employees.

-16-

The plaintiff was not demoted.  Rather, her responsibilities were temporarily reduced in light of her emotional state and enduring physical symptoms caused by stress.  The plaintiff had sources of stress in her life other than receiving Dave Doering's email.  In this regard, plaintiff did not tell Luth or any other supervisor that she was upset about receiving the email until nearly three weeks after she received it.  When Luth became aware of the issue, he immediately informed Brett Gottsch, who subsequently reprimanded Doering for sending the email.  Plaintiff's supervisors, Luth and Hansen, believed that Doering made some sort of apology to the plaintiff.  The plaintiff admitted during her deposition that she had no reason to believe that either of her supervisors, Luth or Hansen, thought the email was appropriate for the workplace, or that they would support Doering in sending an email of that type.

Norma Hansen discussed with Ken Nollette his reluctance to deal directly with the plaintiff. In any event, the plaintiff was able to receive the information she needed from other people in time to finish her reports.  Nollette's childish behavior amounted to nothing more than "petty slights, minor annoyances, and simple lack of good manners" that are not actionable in a civil rights claim.

The court finds that no reasonable employee would have found Gottsch's challenged actions to be materially adverse or to be made in retaliation for the plaintiff complaining of the offensive email.  The plaintiff has not met her burden of making a prima facie case of retaliation.

Even assuming that a prima facie case was presented, the court finds that the stated reasons for plaintiff's termination were not pretextual.  Although it appears that plaintiff worked over 40 hours per week on many occasions, her supervisors were not pleased with her daily attendance record and, I believe, effectively communicated with her their simple requirement that she call the office each day she intended to be absent from work.  Plaintiff's supervisors did not believe she fit in with

the company's "culture."  Under Nebraska law, "unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason." *Jackson v. Morris Commc'n Corp.*, 265 Neb. 423, 426, 657 N.W.2d 634, 636 (2003).  The court finds that Gottsch's actions were not taken in retaliation for plaintiff making a complaint in furtherance of any constitutional, statutory[3] or contractual right.  Viewing the facts and inferences in the light most favorable to the plaintiff, the court finds there is no genuine issue as to any material fact and that Gottsch is entitled to a judgment as a matter of law on plaintiff's claim for retaliation.

### F.   Plaintiff's State Law Claims

Plaintiff has also asserted claims for sexual harassment and retaliation under the Nebraska Fair Employment Practices Act ("NFEPA"),  Neb. Rev. Stat. §§ 48-1101 to 48-1126.  "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII [.]  *See, e.g., Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688, 693 (Neb. 1999); *IBP, Inc. v. Sands*, 252 Neb. 573, 563 N.W.2d 353, 357-59 (Neb. 1997)."  *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002), *cert. denied*, 541 U.S. 1070 (2004).

The court finds that summary judgment should be granted in favor of Gottsch on plaintiff's NFEPA claims for the reasons discussed in conjunction with plaintiff's Title VII claims.

---

[3]Plaintiff did not assert any right to overtime compensation under the FLSA until after she was terminated.  *See* Filing 45-2, Plaintiff's Deposition at pp. 104-105.

# ORDER

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [37] is granted in part, and denied in part, as follows:

    1.    The motion is granted as to all claims asserted against Gottsch Employer's Group, LLC.

    2.    The motion is granted as to plaintiff's Title VII claims based on hostile environment sexual harassment and retaliation.

    3.    The motion is granted as to plaintiff's claims for sexual harassment and retaliation under the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 to 48-1126.

    4.    The motion is denied as to plaintiff's claim for overtime compensation pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

**DATED June 19, 2007.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**